UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DENZEL SAMONTA RIVERS,

               Plaintiff,

v.                                       Case No. 17-cv-1496-pp

DOYAL JOHNSON, *et al.*,

               Defendants.

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT JOHNSON (DKT. NO. 49)**

On June 6, 2019, this court partially granted the defendants' motion for summary judgment and dismissed the complaint against Defendant Loison Kast. Dkt. No. 74. The court ordered that by July 12, 2019, defendant Doyal Johnson must address the plaintiff's assertion that Johnson had reason to know that the plaintiff was at substantial risk of self-harm on April 20, 2017. Id. at 15-16. On July 12, 2019, Johnson submitted a surreply and accompanying documents in support. Dkt. Nos. 77-80. The plaintiff has replied to Johnson's filings and filed his own proposed findings of fact and accompanying documents. Dkt. Nos. 81-83. The plaintiff styled his proposed findings of fact as a motion. Dkt. No. 82. The court will grant the motion to the extent that it will review the plaintiff's proposed findings of fact and consider them in deciding the motion. The court will deny Johnson's motion for summary judgment. Dkt. No. 49.

1

I.   **Additional Facts**

In its order granting summary judgment as to defendant Kast, the court recounted the facts leading up to the events of April 20, 2017. Dkt. No. 74. The court takes the additional facts in this section from the defendants' supplemental proposed findings of fact, dkt. no. 78, the plaintiff's proposed findings of fact, dkt. no. 82, and the parties' declarations and other documents, dkt. nos. 79, 80-1, 81-1, 83.

A.   The Plaintiff's Mental Health History

The plaintiff has been an inmate at Waupun Correctional Institution since January 19, 2017. Dkt. No. 78 at ¶9. In June 2008, during an earlier period of incarceration, the plaintiff was classified as "MH-0," the lowest mental-health classification, and he denied having a history of mental-health problems or suicide. Id. at ¶33. In July 2014, he was re-classified as "MH-1" and diagnosed with Adjustment Disorder with Depressed Mood, Mood Disorder and ADHD. Id. In October 2016, he was reclassified as MH-2a. Id.

The plaintiff reported up to twenty "serious attempts" of suicide, but the defendants indicate that some of his clinicians have noted that his self-reporting has been inconsistent or not supported by his medical records. Id. at ¶34. The plaintiff had two recent "serious" suicide attempts, one on August 3, 2014 at Fox Lake Correctional Institution and one on October 4, 2016 at the Milwaukee County Jail. Id. The plaintiff's records indicate that in December 2016, the plaintiff informed the psychiatric unit of his facility (not Waupun) that "he [was] not suicidal and that he had secondary gain for his complaints of suicidality." Id.

at ¶35. In April 2017, while at Waupun, he reported having "chronic thoughts and behaviors of cutting," though he also "met the criteria for a specifier of Malingering." Id. at ¶¶36-37.

Johnson indicates that as of April 20, 2017, he had had little interaction with the plaintiff and was unaware of his mental health status or any current or past issues with his mental or physical health. Id. at ¶14. Johnson also asserts that he did not have access to any inmate's medical records. Id.

B. Waupun Policy

According to Johnson, when an inmate at Waupun tells an officer he is going to harm himself, or if the inmate is in the process of harming himself, security staff notifies a supervisor over the radio and remains at the inmate's cell until assistance arrives. Id. at ¶31. If an inmate is having suicidal thoughts and wants to speak with someone in the Psychological Services Unit ("PSU"), but does not suggest he is going to harm himself or that he already has, the officer notifies the supervisor (not necessarily via radio), and the supervisor notifies PSU or the Health-Services Unit ("HSU"). Id.

C. The Parties' Versions of April 20, 2017

On April 20, 2017, the plaintiff was housed in the North Cell Hall, which is a general population residence hall at Waupun. Id. at ¶15. Inmates whom Waupun staff have deemed at risk of self-harm are placed on "Observation" status and are not housed in the North Cell Hall. Id. Johnson asserts that he "knew" the plaintiff was not on "heightened suicide" watch on April 20 because, if he were, he would have been placed on observation and not housed in the North

Cell Hall. Id. The plaintiff does not dispute that he was in general population on April 20. Dkt. No. 82 at ¶2.

The parties differ in their version of other events of April 20. Johnson contends that he first interacted with the plaintiff around 9:30 p.m., when he was conducting institution count. Dkt. No. 78 at ¶21. He says that the plaintiff told him that he was having thoughts of suicide and wanted to talk with PSU. Id. at ¶22. Johnson told the plaintiff he would notify the sergeant. Id. Johnson did not see a sign on the plaintiff's cell that said, "Call PSU." Id. at ¶24. He says that the plaintiff was not harming himself and did not tell Johnson he was going to harm himself. Id. at ¶¶23, 25, 29. Johnson says that he "left immediately" to notify the sergeant on duty. Id. at ¶25. A sergeant or other officer told Johnson that "they were already aware of the situation" and had called HSU. Id. Johnson says that the plaintiff notified him only once that he was feeling suicidal and that the plaintiff did not communicate that he was intending to harm himself. Id. at ¶¶27, 32. Johnson did not believe that the plaintiff was expressing an intent to harm himself—Johnson thought the plaintiff was informing him that the plaintiff was thinking of suicide and wanted to speak to someone in PSU. Id. at ¶32. Johnson says he did not believe that the plaintiff was in imminent danger. Id. Johnson says if he *had* believed that the plaintiff was in imminent danger, he would have radioed for assistance or waited at the plaintiff's cell for assistance to arrive. Id. Johnson says that he did not have another interaction with the plaintiff that night. Id. at ¶28.

The plaintiff states that the initial interaction between him and Johnson took place at 9:00 p.m. and not 9:30 p.m. Dkt. No. 82 at ¶4. The plaintiff avers that the "Call PSU" sign was in his cell window at that time. Id., ¶6. He states that he was not placed on suicide watch or crisis until 10:00 p.m. that evening, when Dr. K. DeBlanc placed him on Observation. Id. at ¶3. The plaintiff says that when Johnson arrived to conduct institution count at 9:00 p.m., the plaintiff was feeling suicidal and "was under Suicide Crisis." Id. at ¶4. The plaintiff claims to have interacted with Johnson three times: first during count around 9:00 p.m., a second time when Johnson was passing out controlled medication from the medication cart and a third time when Johnson was passing out non-controlled medication. Id. at ¶¶7, 21. The plaintiff says that he told Johnson on all three occasions that he was suicidal and told him during the second interaction that he was about to cut himself. Id. at ¶22. The plaintiff says that after Johnson walked away from the cell, the plaintiff cut himself and constructed a noose. Id. at ¶24. He asserts that Officer C. Winters found the plaintiff bloody in his cell at 9:30 p.m. Id. at ¶23. The plaintiff alleges that Johnson did not return to the plaintiff's cell and did not assist other officers in responding to his self-harm. Id. Finally, he says that Dr. DeBlanc classified the plaintiff as being a danger to himself and placed him on clinical observation at 10:00 p.m. Id. at ¶25.

**II. Discussion**

    A.    <u>Legal Standards</u>

The court addressed the standard for granting summary judgment, discussed the definition of a material fact, and reviewed the law for a claim of

5

Eighth Amendment deliberate indifference in its previous order. Dkt. No. 74 at 4-5. It will not reiterate those standards here.

B. <u>Disputes of Material Fact</u>

The court previously concluded that it had no evidence regarding the length of plaintiff's incarceration at Waupun, the history of the plaintiff's suicide attempts, Johnson's knowledge of plaintiff's mental health history, Johnson's familiarity with the plaintiff on April 20, 2017, whether the plaintiff was on heightened observation on April 20 and whether Johnson knew if the plaintiff was on heightened observation. Dkt. No. 74 at 15.

The new information provided by the parties shows that the parties do not dispute that on April 20, 2017, the plaintiff was in the general population and, at least as of 9:00 p.m., was not on heightened suicide watch or observation status.[1] The parties do not dispute that Johnson conducted institution check in the North Cell Hall where the plaintiff was housed. The parties do not dispute that Johnson also conducted non-controlled medication pass (though they dispute whether Johnson interacted with the plaintiff while passing out that medication). The parties do not dispute that the plaintiff had a history of suicide attempts, including two recent serious attempts, though those attempts occurred before he

---

[1] Johnson may be incorrect about the precise time he conducted institution count at the plaintiff's cell. He contends it was at 9:30 p.m. But an incident report from that evening shows that Officer Winters found the plaintiff with blood on his forearms at 9:30 p.m. and had him transferred to a strip cell and placed on observation status. Dkt. No. 81-1 at 6. There is no dispute that Johnson was not present when other officers took the plaintiff to segregation and placed him on observation status.

arrived at Waupun. Johnson alleges that he did not know about the plaintiff's mental health history on April 20, 2017, and did not know on that date that plaintiff was having a suicidal crisis.

But the new information also reveals several disputed questions of material fact: Johnson says he spoke with the plaintiff only once, during institution count. The plaintiff says they spoke three times. Johnson avers that there was no "Call PSU" sign in the plaintiff's cell. The plaintiff counters that there was. Although the parties do not dispute that the plaintiff was having a suicidal crisis on April 20, Johnson alleges he was not aware that the plaintiff was having a crisis. Johnson says the plaintiff told him he was having "bad thoughts" and asked to speak with PSU. The plaintiff says he told Johnson not only that he was having suicidal thoughts but also that he was about to harm or cut himself.

What the plaintiff told Johnson during their interaction (or interactions) is important. If the facts are as Johnson alleges—that the plaintiff told Johnson only that he was having suicidal thoughts and wanted to speak with PSU (and told him only once)—then a reasonable jury could not conclude that Johnson disregarded a substantial risk of harm to the plaintiff when he immediately notified a sergeant what the plaintiff had told him, and the sergeant told Johnson that they were aware of the issue. But the plaintiff alleges that he told Johnson up to three separate times that he was having suicidal thoughts *and* that he was going to cut himself. In that situation, a reasonable jury could conclude that Johnson "(1) subjectively knew the prisoner was at substantial risk of committing suicide[,] and (2) intentionally disregarded the risk" by walking away from the cell

and not returning instead of doing more in that moment by, for example, radioing for assistance and staying with the plaintiff at the cell until help arrived. Dkt. No. 74 at 7 (quoting Collins v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006)). Whether Johnson followed Waupun protocol does not alone prove whether he acted with deliberate indifference, but it is evidence that a jury may consider in determining whether he disregarded a substantial risk to the plaintiff's health or safety.

Because these material facts are in dispute, the court will deny summary judgment as to Johnson.

Because the plaintiff has a claim that has survived summary judgment, the court will recruit counsel to represent him. Once the court has found a lawyer to assist the plaintiff, it will send the plaintiff a representation agreement to sign and return to the court. Once the court receives the signed representation agreement, the court will set up a scheduling conference to discuss next steps.

III. CONCLUSION

The court **GRANTS** the plaintiff's request to submit his proposed findings of fact. Dkt. No. 82.

The court **DENIES** Johnson's motion for summary judgment. Dkt. No. 49.

Dated in Milwaukee, Wisconsin this 6th day of September, 2019.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**